# In the United States Bankruptcy Court
# for the
# Southern District of Georgia
## Savannah Division

FILED
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By dreese at 4:26 pm, Mar 30, 2016

In the matter of: )
)  Chapter 13
)
ROBERT GUY KIRK, )
)  Number 15-41584-EJC
)
 *Debtor.* )
)
_____ )
)
JONATHAN STAGGS, )
)
)
 *Movant,* )
)
)
v. )
)
ROBERT GUY KIRK, )
)
 *Respondent.* )

## MEMORANDUM OPINION ON JONATHAN STAGGS'S MOTION TO DISMISS

Before the Court is movant Jonathan Staggs's ("Movant") Motion to Dismiss (dckt. 63) filed on December 21, 2015[1]. The Movant seeks dismissal of this chapter 13 proceeding based upon the narrow grounds of the timing of the filing of the bankruptcy petition and whether it was done solely to avoid the Movant's civil lawsuit. For the reasons stated below, the Court concludes that dismissal under 11 U.S.C. § 1307(c) is not warranted in this case. Accordingly, the instant Motion to Dismiss is DENIED.

## I. JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28

---

[1] The Chapter 13 Trustee's Motion to Dismiss (dckt. 107) is also pending before the Court, but that matter is scheduled for a hearing on April 19, 2016.

U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A). In accordance with Bankruptcy Rule 7052, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

On September 29, 2015, the Debtor filed his chapter 13 petition and plan. (Dckts. 1, 2). At the time of the filing, the Debtor owned and operated a bar known as Pinkie Master's Lounge ("Pinkie Master's"), and this business is the Debtor's primary source of income. In his Statement of Financial Affairs, the Debtor listed a pending lawsuit filed by the Movant in the State Court of Chatham County, Georgia (Civil Action No. STCV15-01505) (the "Civil Lawsuit"). The Debtor describes the Civil Lawsuit as a "complaint for damages" without any further details. However, as will be explained further, the Civil Lawsuit involves a personal injury to the Movant that occurred while he was at Pinkie Master's. On December 21, 2015, the Movant filed the instant Motion to Dismiss seeking dismissal of the Debtor's case pursuant to 11 U.S.C. § 1307(c). The Movant argues that the Debtor filed his chapter 13 petition solely to delay litigation in the Civil Lawsuit [2].

A. <u>The Civil Lawsuit</u>

According to the complaint filed in the Civil Lawsuit, the Movant alleges that on August 9, 2015, a bouncer working at Pinkie Master's, without provocation, stabbed the Movant while he was visiting the bar to say hello to friends. (Dckt. 63, p. 25). As a result of

---

[2] The Movant filed a Motion for Relief from Stay (dckt. 27) seeking leave to continue prosecution of the Civil Lawsuit. That Stay Relief Motion remains pending before the Court.

the stabbing, Movant claims that he "lost a significant amount of blood" and was taken to the emergency room, although he originally declined to be taken by ambulance. *Id.* at p. 26.

On January 27, 2016, the Court held a hearing on the Motion to Dismiss. The Court was able to gather the following additional facts regarding the Civil Lawsuit from the evidence and testimony provided at the hearing[3]:

1. The Movant was previously employed as a bartender at Pinkie Master's for four years, but that employment ended in March 2013. (Dckt. 95, p. 122-23).

2. The Movant continued to be a regular patron of Pinkie Master's after his employment terminated.

3. On July 4, 2015, the Movant got into an argument with one of the bouncers employed at Pinkie Master's over the fact that Movant brought his cat into the bar, lit a match in the men's bathroom, and played a song too loud on the jukebox. Movant decided to leave when confronted by these complaints and exited the bar. After he was outside, Movant described being struck on that occasion by the same bouncer who then told Movant: "Your days at Pinkie's are done; don't ever come back here." (Dckt. 95, p. 123).

4. There is a dispute over whether the Movant was thus barred from Pinkie Master's after this altercation.

5. On August 9, 2015, around 2 a.m. in the morning, the Movant returned to Pinkie Master's for the first time since the July 4, 2015 incident.

6. Shortly after entering the bar, the Movant was stabbed in the chest by the same bouncer with whom he fought on July 4, 2015.

7. The Movant claims he was stabbed without provocation.

8. The Movant was taken to the hospital by his roommate, where he received stitches, but underwent no surgery, for the stab wound to his chest.

---

[3] The Court also viewed a security camera videotape which purports to show Movant walking into the bar, and almost immediately a man approaches him and appears to move his hand toward Movant's mid-section. Thereafter, the Movant can be seen walking around, gesturing, as drops of blood begin to appear on his shirt.

9. The Movant was released from the hospital later that day.

On August 17, 2015, eight days after this incident, Movant's attorney, Richard H. Middleton, Jr., sent a letter to the Debtor with a settlement demand of $1,000,000.00 for the injuries suffered by the Movant at Pinkie Master's, but generously allowed the Debtor ten (10) days to pay the money before a lawsuit would be filed. (Dckt. 63, p. 19).

On September 22, 2015, Middleton filed the Civil Lawsuit on Movant's behalf seeking unspecified damages, including punitive damages[4]. The Debtor was named as a defendant along with Marty and Coleen Hogan, the owners of the building where Pinkie Master's was located. The Movant argues that the Debtor is liable for the Movant's personal injuries under several legal theories, including ordinary negligence, respondeat superior, negligence *per se*, and negligent hiring, retention and supervision. (Dckt. 63, p. 28). The Movant further alleges that the Debtor's landlords, Martin and Coleen Hogan, are also liable for his injuries under various theories of general negligence. *(Id.* at p. 26).

B. <u>Merits of Movant's Lawsuit</u>

The Movant's lawsuit does not appear especially meritorious. First, despite Middleton's description of Pinkie Master's as a "dangerous establishment", the Movant was "a staunch regular" at the bar since his employment ended there in March 2013. (Dckt. 95, p. 137, ln. 11). Moreover, on the night of the stabbing incident, Movant had *recommended*

---

[4] Presumably, any judgment obtained by the Movant would be dischargeable in the Debtor's current bankruptcy case. The dischargeability deadline has already come and gone, and no parties, including the Movant, have filed an adversary proceeding seeking a determination that their debt is non-dischargeable. At the January 27, 2016 hearing, the Court made the parties aware of this missed deadline, but Movant's counsel seemed unaware of the significance of that date.

Pinkie Master's to some people he met at a concert.

> Q. Now, let's go up five weeks later to the night of the [stabbing] incident. What did you do that night?
>
> A. That night was my girlfriend and I's three-year anniversary. We had dinner. Then we went to a show, a concert. Met some people. They said, hey, where is a good place to hang out? I said, oh, you gotta go to the dive bar, Pinkie Master's. On my way after dropping my girl off, I went by Pinkie Master's to see if those people had a good time. . . .

(Dckt. 95, p. 140, ln. 7-14).

Second, when he arrived at Pinkie Master's on August 9, 2015, Movant was armed with a knife although he claims he did not "pull the knife" until after he was stabbed[5]. (Dckt. 95, p. 142, ln. 21-22). Third, after being stabbed, the Movant did not seek medical treatment until he returned home.

> Q. And they tried to make a deal about you didn't go to the hospital in an ambulance. Did you take yourself – have yourself taken to the hospital?
>
> A. I had my roommate take me when I got home because I couldn't afford a $5,000 car ride.

(Dckt. 95, p. 143, ln. 7-11).

Fourth, Movant had some history with the bouncer. When they had worked together, Movant complained that the bouncer was "worthless," and the bouncer was aware of the Movant's low opinion of him. (Dckt. 95, p. 144). In fact, Movant quit working at the bar, at least in part, because of the bouncer. Last, after the July 4th incident where the Movant was hit from behind and pummeled by the bouncer, he did not report the incident to

---

[5] Middleton's demand letter decries the "knife attacks and stabbings" and "violent assaults" perpetrated at Pinkie Master's although no evidence of such incidents (except the two involving the Movant) was presented.

the police or notify the Debtor.

> Q. Did you tell Guy Kirk about [the July 4th incident]?
>
> A. No.
>
> Q. Do you know whether Mr. Kirk was even aware that it happened?
>
> A. Well, I would assume so.
>
> Q. Well, why would you assume so?
>
> A. Because guys are rolling on the ground, he's pulling out a baton. You can sneeze at Pinkie Master's and they'll say God bless you at Forsyth Park. I mean if one thing happens, everybody is talking, so he had to know about it, yes.
>
> Q. Was Mr. Kirk there that night?
>
> A. No. He's never there except for St. Patrick's Day or to pick up money in the morning out of the ATM or the register.
>
> Q. All right. So you don't know if he knew anything about it, but if he did know something about it, it would have been second or third-hand information.
>
> A. Yes.
>
> Q. But you did not tell Mr. Kirk anything about the July 4th incident?
>
> A. No.

(Dckt. 95, p. 145-46).

Middleton's August 17, 2015 demand letter went far beyond describing the Movant's personal injuries and setting forth a theory of recovery. Aside from the stated intentions to sue for personal injuries, the three-page letter recited numerous accusations about activities and business practices at the bar, including the following:

> When filed, the discovery in this case will reveal your knowledge, promotion and acceptance of this bar business, which has knowingly and conveniently skirted state laws and regulations, including but not limited to the following:
>
> • The operation of an establishment with a liquor license held in a fictitious name;

- The purchase of alcoholic beverages at retail stores intended for resale through the practice of "back-pouring" of beverages;
- The improper compensation of "employees";
- The non-collection of required taxes;
- The reliance on "all cash" transactions to avoid the creation of any paper trail of this business;

(Dckt. 27, p. 17). The business practices described above (which sound like matters that may have been learned by Movant during his four years of employment) have nothing to do with the personal injury case. The letter included a threat to make these and other allegations (i.e. witness tampering and spoliation of evidence) a "matter of public record" that would be "fully aired." *Id.*

C. <u>The Debtor's Bankruptcy Filing</u>

On September 29, 2015, at approximately 9:55 a.m., the Debtor was served at his residence with a copy of the Civil Lawsuit summons and complaint. (Dckt. 63, p. 35). At the time the Debtor was served, the Debtor stated to the process server "[the Movant is] suing me for a million bucks . . . [s]o you know what I did? I went bankrupt . . . [h]ey, nothing he can do to me." (Dckt. 63, p. 39, lines 2-8). Later that afternoon, at 3:50 p.m., the Debtor filed his chapter 13 bankruptcy petition. (Dckt. 1).

On October 23, 2015, the Debtor's § 341 Meeting of Creditors was held, and appearances were made by O. Byron Meredith, III (Chapter 13 Trustee), John Pytte (Attorney for Debtor), the Debtor, and Robert E. Falligant and Scott Harrison (Attorneys for Movant). At the § 341 meeting, the Debtor made multiple statements that the Civil Lawsuit was the main reason he filed for bankruptcy. *See* Dckt. 63, p. 108, lines 8-13; Dckt. 63, p. 112, lines 23-25. However, when directly asked by Attorney Harrison, "What is the reason you filed

for bankruptcy?" the Debtor answered "[b]ecause there's a million dollar lawsuit against me. I don't have 50 to $75,000.00 to find a lawyer. . . ." (Dckt. 63, p. 108, lines 14-22). It is undisputed that the Debtor has no liability insurance that would cover the costs of defending the lawsuit. Movant's counsel, who also represents Movant in the Civil Lawsuit, stated at the January 27, 2016 hearing that his prosecution of the Civil Lawsuit would likely require 15 to 20 depositions and that a jury trial could take two to three days. (Dckt. 95, p. 41, 44). Counsel conceded that the costs of defense could easily exceed $50,000.00. Id. at p. 44.

D. Debtor's Other Financial Obligations

In addition to the Movant's claim, the Debtor's schedules list $315,999.88 of secured debts and $64,202.86 of general unsecured debts. The Debtor also lists a $1,416.12 unsecured priority claim held by the Chatham County Tax Commissioner. Some of these financial obligations include car payments for four different vehicles[6], a mortgage payment on the Debtor's personal residence, credit card payments, and payments on recreational vehicles, specifically a jet ski and a four-wheeler. To date, there have been twenty (20) proofs of claim filed in this case, which total $359,060.44.

At the January 27, 2016 hearing, the Debtor testified that prior to his bankruptcy, he had taken out a $50,000.00 high-interest loan from On Deck Capital[7] and a

---

[6] According to the Debtor's Schedule D, the Debtor receives the monthly payment on two of the vehicles from his son, and then pays the creditor himself.

[7] On January 22, 2016, CACH, LLC, who purchased the loan from On Deck Capital, Inc., filed a proof of claim in the amount of $54,075.68 (Claims Register 20-1). The document attached to that claim reflects a repayment schedule of $204.76 per day. *Id.*

$20,000.00 high-interest loan from Max Advance in an effort to consolidate his bills[8]. (Dckt. 63, p. 98). He further testified that these loans required him to make payments totaling $400.00 per day. *Id.* The Debtor indicated that these daily payments had become a financial burden, however, he ultimately decided to file for bankruptcy after the Civil Lawsuit was filed because it was "the straw that broke the camel's back." (Dckt. 95, p. 48, line 10).

E. <u>Debtor's Dispute With Landlord</u>

At the time of the filing of the petition, Pinkie Master's was located at 316-318 Drayton Street, Savannah, Chatham County, Georgia 31401 (the "Premises"). Since 2007, the Debtor leased the property from Martin and Coleen Hogan pursuant to an oral, month-to-month tenancy at $3,000.00 per month. However, on November 11, 2015, the Hogans filed a Motion for Relief from Stay (dckt. 29) seeking to terminate the tenancy and take sole and exclusive possession of the premises. According to the Debtor's testimony at the January 27, 2016 hearing, the Hogans' decision to terminate the tenancy was a direct result of the stabbing incident. On November 19, 2015, the Court entered an order granting the Hogans relief from the stay, but allowed the Debtor to occupy the Premises until January 5, 2016. (Dckt. 33). This forced the Debtor to either close Pinkie Master's permanently or move it to a new location[9].

---

[8]The Debtor admitted at the January 27, 2016 hearing that he spent approximately $6,000.00 of the loan proceeds on a family vacation. (Dckt. 95, p. 101-102).

[9]At the January 27, 2016 hearing, the Debtor testified that he has secured a new location for Pinkie Master's. However, the Court is unsure whether the Debtor has began operations at this new location.

## III. CONCLUSIONS OF LAW

"The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279 (1991)). Accordingly, the debtor's good faith, or lack thereof, is a recurring theme throughout the Bankruptcy Code, including the section concerning the dismissal of a chapter 13 case for cause. Section 1307(c) of the Bankruptcy Code provides that a chapter 13 case may be dismissed or converted "for cause." Section 1307 further provides a non-exclusive list of examples of what constitutes "cause" for dismissal. Although bad faith, or a lack of good faith, is not included in this list, bad faith can constitute cause for dismissal under section 1307(c). *Marrama*, 549 U.S. at 373; *In re Piazza*, 719 F.3d 1253, 1263 (11th Cir. 2013); *Orcutt v. Crawford*, 2011 WL 4382479, at *2 (M.D. Fla. 2011).

The Eleventh Circuit has held that when conducting a good faith analysis bankruptcy courts should consider the facts and circumstances of the individual case. *Kitchens v. Georgia R.R. Bank and Trust Co. (In re Kitchens)*, 702 F.2d 885, 888-89 (11th Cir.1983). In *Kitchens*, the Eleventh Circuit listed the following factors to be considered when determining a debtor's good faith:

(1) the amount of the debtor's income from all sources;

(2) the living expenses of the debtor and his dependents;

(3) the amount of attorney's fees;

(4) the probable or expected duration of the debtor's Chapter 13 plan;

(5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;

(6) the debtor's degree of effort;

(7) the debtor's ability to earn and the likelihood of fluctuation in his earnings;

(8) special circumstances such as inordinate medical expense;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors;

(10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors;

(11) the burden which the plan's administration would place on the trustee.

(12) the extent to which claims are modified and the extent of preferential treatment among classes of creditors;

(13) substantiality of repayment to the unsecured creditors; and

(14) any other factors or exceptional circumstances.

*Kitchens*, 702 F.2d at 888-89.

Although the court in *Kitchens* applied these factors to determine whether a chapter 13 plan was proposed in good faith under 11 U.S.C. § 1325(a)(3), this Court has held that the same factors should be used to determine whether the petition was filed in good faith. *In re Jacobs*, 2005 WL 6742490, at *2 (Bankr. S.D. Ga. April 22, 2005)(Davis, J.). When determining whether a petition was filed in good faith, courts have also considered some or all of the following factors:

(1) the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding;

(2) the timing of the petition;

(3) how the debt arose;

(4) the debtor's motive in filing the petition;

(5) how the debtor's actions affected creditors;

(6) the debtor's treatment of creditors both before and after the petition was filed;

(7) whether the debtor has been forthcoming with the bankruptcy court and the creditors;

(8) whether the debtor misrepresented facts in her petition, unfairly manipulated the Bankruptcy Code, or otherwise filed her Chapter 13 petition in an inequitable manner;

(9) the debtor's history of filings and dismissals;

(10) whether the debtor only intended to defeat state court litigation; and

(11) whether egregious behavior is present.

*In re Buis*, 337 B.R. 243, 251-52 (Bankr. N.D. Fla. 2006).

Because dismissal of a petition is a more severe remedy than denying confirmation, a dismissal under § 1307 requires a more stringent showing of a lack of good faith, and the burden of proof is on the moving party. *Jacobs*, 2005 WL 6742490 at *2. Finding that a petition was not filed in good faith does not require a finding of actual fraud, necessitating proof of malice or scienter. *Shell Oil Co. v. Waldron (In re Waldron)*, 785 F.2d 936, 941 (11th Cir.1986). "Broadly speaking, the basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose or spirit" of the Bankruptcy Code. *Kitchens*, 702 F.2d at 888.

In this case, the Movant argues that the Debtor filed his petition in bad faith

on the narrow grounds that it was done solely to avoid the Civil Lawsuit[10]. To support this contention, the Movant provided evidence of several instances in which the Debtor admitted that the Civil Lawsuit was the main reason he filed for bankruptcy. In addition, the Movant argues that the timing of the Debtor's filing, just hours after being served with process in the Civil Lawsuit, provides further evidence of the Debtor's bad faith.

Bad faith can be found where a debtor seeks to evade, often at the last minute, a meritorious lawsuit that the Plaintiff has been pursuing for a long time. *See In re Dixie Broadcasting, Inc.*, 871 F.2d, 1023, 1027 (11th Cir. 1989) (finding bad faith where a financially sound Debtor filed its petition when it appeared that an adverse ruling was imminent in state court litigation that had been underway for more than two years); *Furness v. Lilienfield*, 35 B.R. 1006 (D. M.D. 1983) (petition dismissed which had been filed just prior to district court civil RICO trial after a continuance in the trial had been denied). Unlike *Dixie Broadcasting* and *Furness*, the Debtor's bankruptcy filing is not a last-ditch effort to defeat an adverse ruling in the Civil Lawsuit. The Debtor made the decision, albeit a quick one, that bankruptcy was the only alternative to dealing with the Civil Lawsuit because he had no liability insurance and did not think he could afford to pay a lawyer to defend him in the case.

In further contrast to *Dixie Broadcasting* and *Furness*, as recited above, the merits of Movant's lawsuit are debatable. To be sure, had he sued the actual stabber, the

---

[10] The Court has considered the other factors outlined above, but does not find that, on balance, such factors support dismissal based on the limited record before the Court. Of course, the Court may revisit some of these factors when it takes up the Chapter 13 Trustee's Motion to Dismiss on April 19, 2016.

merits of his case would be more obvious. But here, Movant has chosen to sue a bar owner based on a negligent hiring theory, among others. Movant's personal injuries appear minimal. Movant testified at the hearing and the Court had an opportunity to evaluate him as a witness. Though somewhat theatrical, he does not make a sympathetic witness. On one hand, his lawsuit claims that the Debtor allowed criminal activities and violence to take place at Pinkie Master's. Yet, as a former employee and frequent visitor since March 2013, Movant would be privy to such alleged activities, and he was in fact involved in the incident of July 4, 2015. However, Movant still chose to frequent the bar even after being encouraged not to return. Why, when the Movant arrived at the bar at 2:00 a.m., he was immediately confronted by the bouncer is a mystery that has yet to be explained, but no doubt reflects a history between these two men of which the Debtor may have been unaware. The videotape evidence had no audio and the Court was not provided with any evidence of verbal exchanges between the Movant and the bouncer.

In short, the Movant was not on the brink of obtaining a judgment against the Debtor that he sought to avoid by filing bankruptcy. Here, it appears questionable whether the Movant will recover anything but nominal damages in the lawsuit. Morever, the costs of defense could easily outweigh any recovery the Movant might expect from a jury verdict.

Bad faith is a two-way street. Middleton's demand letter was more a declaration of war. The allegations regarding the Debtor's business practices are wholly irrelevant to a suit for personal injury, and Middleton's reference to those collateral matters in the letter was designed to intimidate the Debtor. The allusions to witness tampering,

spoliation of evidence, and the threat "to fully air" and make "a matter of public record" all of the allegations only served to emphasize the inevitable costs of defense, which gave the Debtor a reason to file bankruptcy.

Mr. Staggs has overplayed his hand. This is not a million-dollar lawsuit. Middleton's inflated demand simply guaranteed that the Debtor was in a no-win situation. The Debtor's response to the Movant's overreaching was not unreasonable and is not "an abuse of the provisions, purpose or spirit" of the Bankruptcy Code. Accordingly, the Debtor's decision to file for bankruptcy in response to the Civil Lawsuit was not in bad faith, and thus does not warrant "for cause" dismissal pursuant to 11 U.S.C. § 1307(c).

In *Waldron*, the Eleventh Circuit found the debtors proposed a chapter 13 plan in bad faith because they were financially stable and admittedly filed their petition for the sole purpose of rejecting an unprofitable option agreement. The court found that "[the debtors'] only motive was to enhance their financial coffers by manipulating and abusing the bankruptcy process." *Waldron*, 785 F.2d at 939-40. Here, the Debtor only admitted that the Civil Lawsuit was the main reason he filed for bankruptcy, not the *sole* reason. (emphasis added). At the January 27, 2016 hearing, the Debtor testified that the Civil Lawsuit was the "straw that broke the camel's back," but that the $400.00 daily payments on his high-interest loans also impacted his decision to file for bankruptcy. In addition, the Debtor's Schedules lists several other secured and unsecured debts owed by the Debtor. In this case, the filing of a chapter 13 petition would serve a useful purpose – to facilitate the adjustment of the Debtor's debts through reorganization. Therefore, the Court does not find that the Debtor's

petition was filed in a bad faith attempt to use and abuse Chapter 13 for an unworthy purpose.

For the reasons stated above, the Court does not find that the Debtor filed his chapter 13 petition in bad faith, and thus "cause" does not exist pursuant to 11 U.S.C. § 1307(c) to warrant dismissal of the Debtor's case. Therefore, the Motion to Dismiss (dckt. 63) is DENIED. The Court will enter a separate order consistent with the foregoing Findings of Fact and Conclusions of Law.

Dated at Savannah, Georgia, this 30th day of March, 2016.

_____
Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia